IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| ROSILYNN RICHEY, ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 02-PWG-3152-W |
| | ) |
| TRAVEL CENTERS OF AMERICA TA TRUCK | ) |
| d/b/a BUSINESS LEISURE, et al., | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OF OPINION

This matter is before the court for consideration of the motion of Travel Centers of America

TA Truck d/b/a/ as Business Leisure and Travel Center, Inc. for summary disposition of all claims

by each plaintiff in the above-captioned civil action.  (Doc. #39; see also docs. #40 and #41).

Plaintiffs have filed a response to the motion and a supplemental response.  (Docs. #46 and #47).

An amended brief in support of the motion for summary judgment was filed by the defendant

together with additional supplemental evidentiary materials.  (Doc. #57 and #58).  The matter is

before the undersigned magistrate judge pursuant to the provisions of 28 U.S.C. § 636(c), the parties

having consented to dispositive jurisdiction.  (See docs. #6 and #7).

PROCEDURAL HISTORY

Consideration of the motion for summary judgment is complicated by the dissimilarities of

claims raised by individual plaintiffs in this action.[1]  This action purports to arise under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 1981, 42 U.S.C. § 1983 and the law of Alabama for the

---

[1]     In addition, there have been a number of delays which have arisen from the difficulty in locating one or more
of the plaintiffs.  While plaintiffs' counsel has been diligent in the attempt to proceed, an apparent lack of
communication has created certain administrative problems.

intentional infliction of emotional distress. (See doc. #1).[2]  The complaint as initially filed identified

three plaintiffs.  Rosilynne Richey, a African American female employed by the corporate defendant

from February 15, 2002 through March 2, 2002.  (Doc. #1, ¶ 5).  The second plaintiff, Doxkey

Eddings, is an African America female employed from September 21, 1998 through March 2, 2002.

( *Id*. at ¶ 6).  The third plaintiff, LaQuilla McNeal, is an African American female employed by the

defendant from February 2000 through her discharge in August 2003.  ( *Id*. at ¶ 7 and see doc. #47,

pp.12-13).  Melanie S. Hodges, the fourth plaintiff, was added by amendment on January 16, 2003.

(See doc. #2).  Ms. Hodges, a Caucasian female, was employed by the defendant from June 22, 2001

until her discharge on March 13, 2002.  (See doc. #47, pp.16-17).  The complaint recites a number

of factual averments which refer in an omnidirectional fashion to alleged acts of sexual harassment,

racial harassment and pretextual termination without identifying to which plaintiffs the alleged facts

might apply.  (See ¶ ¶ 9-21).[3]  The complaint then "lists" a number of statutory and common law

causes of action.  They are sexual harassment; retaliation; intentional infliction of emotional distress;

hostile work environment; and constructive discharge.  (Complaint, ¶ ¶ 22-35).  The list is not set

out as "counts" of the complaint but, rather, are merely numbered as causes of action.  A second

difficulty in assessing the complaint also arises from the fact that one of the plaintiffs is Caucasian

and three are African American.  One of the African American plaintiffs makes only a sexual

harassment and retaliation claim, but not a race discrimination claim.[4]  The complaint does not

---

[2]      There is simply no basis for an action under 42 U.S.C. § 1983.  Action by a person acting under color of state law is the essential element of a claim under the statute.  There is no allegation by any plaintiff of such conduct by a defendant.

[3]      In a later pleading plaintiff Doxkey Eddings contends that she was subjected to religious discrimination although the complaint makes no such claim.

[4]      See defendant's exhibit R, EEOC charge of Rosilynne Richey and exhibit P, Richey depo., pp.39-40.

attempt to distinguish which plaintiff was subjected to which act of alleged misconduct said to give rise to a discrete cause of action applicable to that plaintiff.  In simple terms the complaint essentially presents four separate lawsuits in which certain evidence overlaps.  It is for that reason that the defendant's motion for separate trials was granted.  (See doc. #59 and docket entry of 12/23/04).[5/] In light of the lack of specificity of the complaint this opinion is organized as follows.  First, the court identifies those facts which appear to be common to all plaintiffs.  Second, the actual claims applicable to each individual plaintiff are set out with relevant factual averments.  Third, the claims asserted by the individual plaintiff are analyzed within the general matrix established by Rule 56 and, finally, a disposition of the claims identified for each plaintiff.  Certain claims which were arguably raised in the complaint were not addressed by plaintiffs in reply to the defendant's motion for summary judgment.  In some instance the failure to respond to the challenge compels the conclusion that the claim has been abandoned.

Undisputed facts common to all plaintiffs

Travel Centers, the defendant (hereinafter TA for Travel Centers of America TA Truck) operated a truck stop and convenience store at 3505 Buttermilk Road in Tuscaloosa, Alabama in the relevant years 1998 through 2004.  The business had four departments or "profit centers" under the direction of a profit center manager who reported to the unit general manager.  The incidents which give rise to the complaint arose primarily at the fuel desk.  During the relevant time period the general manager was Jack Crowley, a Caucasian male.  Each of the profit center managers reported to Crowley.  Each profit center manager had an assistant manager.  During much of the relevant time

---

[5/]   Plaintiffs filed an opposition to the motion for separate trials.  The opposition was untimely.  The defendant's motion to strike the opposition was determined moot when after consideration of the defendant's motion and the untimely response the court concluded that the defendant's motion was well taken.

period Fagan Robinson, a white male, was an assistant profit center manager in the convenience store where he reported to the convenience store profit manager, Tim Barrell, also a white male. While in the convenience store center, Robinson worked at times with plaintiffs Laquilla McNeal, an African American female, and Melanie Hodges, a Caucasian female.   In December 2001 Robinson was transferred to the position of head cashier at the fuel desk where he worked with Doxkey Eddings, an African American female, and later Rosilynne Richey, an African American female.   The profit center managers have the authority to hire, fire and discipline employees. (Exhibit C, Aff. of Tim Barrell, ¶ 5).[6/]   The district manager for the Travel Centers Stores in the Tuscaloosa area was Barry Richards, a Caucasian male.  (Doc. #41, exhibit D).   During the relevant time period, Travel Centers of America had a published employment policy which purported to provide for "zero tolerance" for racial or sexual harassment.  (Doc. #41, exhibit A).  This policy was explained, *inter alia*, using videotapes during the orientation of all new employees.

Factual averments–Rosilynne Richey

Rosilynne Richey, an African America female, was employed by TA during a 16 day period from February 15 through March 2, 2002.   When Ms. Richey first attempted to apply for employment on February 11, 2002, she initially spoke to Tim Barrell.  Barrell told her to come back another time.  Ms. Richey then approached Assistant Manager Fagan Robinson.  Robinson talked with Richey and accepted her application.  Ms. Richey alleges that Robinson began asking her to

---

[6/]   Barrell also asserts that Mr. Robinson, "..., did not have the authority to hire, fire, discipline or otherwise affect any employee's working environment."  *Id*. at ¶ 9.  (emphasis added).  Whether or not Robinson had the authority to hire, fire or discipline would not establish that he also lacked the authority to "affect any employee's working environment."   Moreover, there is ample evidence from which a finder of fact could reasonably conclude that Robinson in fact had the authority to both hire and fire employees.  There is also a substantial body of evidence that Robinson alone disciplined employees.  The affidavits of Crumpton, Richards and Barrell do not refute that evidence.

come visit him in his trailer during the application process.  On February 14, 2002 Fagan Robinson called Ms. Richey to ask her if she was ready to come to work.  (Doc. #41, defendant's exhibit 2; Richey depo., p.66).  Following an orientation, Ms. Richey waited in her car while Robinson went into the main building to procure uniform shirts.  When he returned with the shirts, he reached through the car window and while ostensibly handing the shirts to Richey he intentionally groped her breast.  (*Id*. at pp.75-76).  Ms. Richey told him never to do that again.  (*Id*. at p.77).  Ms. Richey did not report the groping incident to anyone.  (*Id*. at p.77).[7/]  Robinson telephoned Ms. Richey later the same day and again asked her to come to his trailer to drink beer.  The next day, February 16, Robinson intentionally brushed against Ms. Richey so that he touched her.  (*Id*. at pp.81-82).  Robinson continued to telephone Ms. Richey over the following days asking her to come over to his trailer implying she was to give him sex.  Ms. Richey testified that she was repeatedly required to tell Robinson that she would not visit him.  At some point during her short period of employment, Robinson told Richey that he wanted to "f— [her]" (*Id*. at p.110).  After these repeated refusals, Robinson began to criticize Richey's performance on February 26.  He warned Richey about a cash shortage in her cash drawer.[8/]  On March 2, 2002 Robinson became agitated with Richey because of a delay in authorizing the use of gas pumps.  Although the center employed two fuel clerks at that time, Robinson directed his comments only to Ms. Richey.  Robinson pushed Ms. Richey's hand away from a machine and "yelled loudly" at her in front of customers.  (p.107).  He then clocked out

---

[7/]       Richey testified that later after other acts of harassment Robinson told her that Jack Crowley was an old friend who knew that Robinson did not need a job.  He told Richey that if she told Crowley about the harassment Crowley would not do anything but listen.  (Richey, pp.91-92) (See also, pp. 141-143).

[8/]       Richey testified that it was later discovered that there was no cash shortage.  She also testified that only Fagan Robinson had access to her cash drawer.

Ms. Richey's time card, ending her employment hours for the day.[9/]  On March 4 Ms. Richey spoke

with Manager Crowley.  In this meeting, she told Crowley that Robinson had pushed her.  (*Id*. at

pp.119-120).  Crowley said he would "check it out."  *Id*.  Crowley never called Ms. Richey back.

The day after Ms. Richey met with Crowley she was arrested by state authorities.  (*Id*. at 121).  She

did not hear from Crowley.  She did not return to TA for a period of two weeks.  *Id*.  Crowley told

her that he had seen that she had been arrested.  He also told her that she was no longer needed.  Ms.

Richey contends that her refusal to provide sexual favors to Robinson led to her termination.  (*Id*.

at p.127).  Ms. Richey was not racially harassed.  Her "hostile work environment" claim is subsumed

by analysis of her tangible employment action claim of unlawful termination.  She has also alleged

the Alabama tort of outrage.

Doxkey Eddings

        Ms. Eddings was hired by the defendant in September, 1998.  At that time, Fagan Robinson

was the assistant manager of the convenience store.  (Doc. #41, defendant's evidentiary submissions,

exhibit J, Eddings depo., pp.56-57).  Robinson reported to Tim Barrell who in turn reported to Jack

Crowley.  From May of 2001 until her discharge in March 2002, Ms. Eddings usually worked on the

3:00 to 11:00 or 3:00 to 12:00 shift on the fuel desk.  Robinson generally worked the day shift from

6:00 a.m. to 3:00 p.m.  (*Id*. at pp.58,62).  Ms. Eddings testified that the shift overlapped and that

Robinson sometimes worked after 3:00 p.m.  In December 2001, Robinson was assigned to the fuel

desk where Eddings was working.  (*Id*. at pp.69-70).[10/]  Ms. Eddings frequently kept a Bible on the

---

[9/]        According to Doxkey Eddings, Ms. Richey worked the 3:00 p.m. to 11:00 p.m. shift while Robinson worked
        6:00 a.m. to 3:00 p.m..  (Defendant's exhibit J, depo. of Doxkey Eddings, pp.79-80).

[10/]       There is evidence that after Robinson had been accused of sexually harassing another female employee he was
        transferred from the convenience store to the fuel desk.

fuel counter although she states that she did not "witness to" or discuss religion with customers.  Ms. Eddings has stated that the general manager and other employees were aware that she kept her Bible on the counter where it could be seen.

It is undisputed that on February 28[11] Mr. Crowley had distributed a memorandum directing employees to keep material out of sight.[12]  Ms. Eddings alleges that prior to February 2002 she had talked about the display of her Bible with Mr. Crowley who told her

> I don't see a problem with your Bible sitting on your work station as long as you're not evangelizing or witnesses to anyone,"

(Depo. at p.120).[13]

It is undisputed that the memorandum directing employees to keep reading material out of sight was posted on the bulletin board through the date of Ms. Eddings' termination.

Ms. Eddings avers that at some point she learned from Cindy Kelly, Rosilynne Richey and Kenny Irvin of allegations of sexual harassment made against Fagan Robinson.  She also observed what she believed to be an act of sexual harassment involving Fagan Robinson and a woman, Gloria Lee, when Robinson walked up behind Lee and intentionally brushed against her.  (*Id*. at pp.101-102).  In February 2002, Ms. Eddings loudly told another employee, Kenny Irvin, that "the women," meaning the victims of sexual harassment, should report Fagan Robinson's conduct.  (*Id*. at pp.103-105).  Ms. Eddings intentionally spoke loudly while talking to Irvin so that Robinson would

---

[11]    The memo was probably issued in February of 2002 although Ms. Eddings answered "yes" to a question indicating the memo was posted in 2000.  (p.121).  A copy of a memo indicates it was written in 2002.

[12]    Ms. Eddings did not acknowledge receiving the memorandum.  She also avers that a white employee, Carolyn Hall, kept reading material on the counter and was neither disciplined or fired.

[13]    Whether Crowley actually told Ms. Eddings that it was acceptable for her to display her Bible is in dispute.

overhear. (*Id*. at pp.104-105).[14/] Robinson never acknowledged to Eddings that he had in fact heard what she told Irvin.  Irvin never told Eddings that Robinson had said that he heard the comments. ( *Id*. at p.109).  Irvin did tell Eddings, however, that he believed Robinson heard what was said. ( *Id*. at pp.106-107).[15/]

On a Tuesday night shortly after Ms. Eddings had loudly announced that the victims of sexual harassment should report the abuse Robinson approached her to tell her that Crowley had criticized him for allowing Eddings to display her Bible.  Ms. Eddings claims that she then called Crowley who told her that he saw no problem with the Bible.  On Wednesday, Robinson told Eddings that he [Robinson] would have the final say.  When she returned to work on Sunday following her days off on Thursday and Friday, Robinson told her to put her Bible in the drawer. When she replied that Crowley said that she could keep the Bible, Robinson told her to clock out. When she refused to do so, Robinson "... wrote up termination papers."  (*Id*. at p.132).  On the following day, Ms. Eddings met with Crowley.  Crowley confirmed that Eddings had been terminated for insubordination.  (*Id*. at p.133).

Ms. Eddings was never personally subjected to sexual harassment.  Ms. Eddings was never subjected to acts of racial hostility nor personally subjected to racial epithets.  She does not claim

---

[14/]     Q:     Now, you go on to say, "when Mr. Robinson found out that I knew."  How do you know that Mr. Robinson that you were that Ms. Kelly and Ms. Richey and Ms. Lee had allegedly been sexually harassed?
          A:     He overheard a conversation that was intended for him to hear between me and Kenny Irvin where I was telling him that – Kenny Irvin that he was sexually harassing Cindy and they should go ..."
(*Id*. at pp.103-104).

[15/]     The defendant contends that there is no proof that Robinson heard the comments.  This claim ignores the circumstantial evidence that he did. Taken in the light most favorable to Ms. Eddings, she spoke loudly enough that she and Irvin believed that Robinson heard her.  Shortly thereafter Robinson fired her.

that she was subjected to a racially or sexually hostile work environment.[16/]  On March 27, 2002 Ms. Eddings along with Cindy Kelly, Rosilynne Richey, Gloria Lee, Laquilla McNeal and Melanie Hodges appeared at the offices of the EEOC. Ms. Eddings told the EEOC that she was fired for bringing her Bible to work and refusing to put it in a drawer.  (*Id*. at p.150).  She also, however, signed an EEOC charge alleging that her termination was related to her knowledge of Robinson's sexual harassment of women employees.  She alleged that a white employee, Betty Hall, was not fired for keeping reading material on the counter.  She alleges that she was discriminated against on the basis of her race when she was terminated for the same conduct.  Ms. Eddings alleges that she was subject to an adverse tangible employment action when disciplined and terminated because she urged other employees to report sexual harassment.  She was not sexually harassed and has asserted no state law action.

Laquilla Ann McNeal

Laquilla Ann McNeal was employed with TA from February 14, 2000 through February 5, 2003.  (Doc. #41, defendant's exhibit E, McNeal depo. at p.6).  In March of 2003 Ms. McNeal filed a charge of discrimination with the EEOC alleging that she had been sexually harassed when Fagan Robinson had rubbed her neck and touched her side.  She averred that she was subjected to profane and abusive language by both Tim Barrell and Fagan Robinson.  She told the EEOC that she believed that Barrell and Robinson abused her because of race.  (Exhibit H) (See also, McNeal depo. at p.96).  Eleventh months after she filed her EEOC complaint, David Crumpton, the new general manager for TA's Tuscaloosa operation suspended, then fired, Ms. McNeal.  (McNeal depo. at p.

---

[16/]     Indeed, despite a belated attempt to raise a First Amendment claim Ms. Eddings stated that she was not fired "because of [her] Bible" but because Robinson was retaliating for her comments to co-employee Kenny Irvin expression that sexual harassment victims should report Robinson's misconduct.  (Eddings' depo., p.198).

101).  The reason given for terminating Ms. McNeal was that she knew that a white employee by the name of Betty Ward had stolen coffee from the convenience store and Ms. McNeal had failed to report the theft.  (McNeal depo. at pp.102-105).[17]  Ms. McNeal acknowledged that she was told that Ward had been suspended but that she did not know whether Ward had been fired.  ( *Id*. at pp.115-116).  In fact Ms. Ward was also fired.  (Defendant's exhibit B, Crumpton Aff., p.2. ¶ B).  Ms. McNeal complains that Ward was not disciplined "immediately."  McNeal also testified that co-workers had once told her that Fagan Robinson had said that "... black people were sorry."  ( *Id*. at p.138).  She has also testified however that she had never heard Robinson make disparaging remarks about African American employees or customers.  Ms. McNeal does not allege facts which would give rise to an outrage claim under Alabama law.  Her claims are sexual harassment in the single incident referred to above and disparate treatment because of her race.  She does not allege a constructive discharge claim.

Melanie Hodges

Melanie Hodges is a Caucasian female.  Ms. Hodges began her employment with TA in June of 2001 and was terminated in February of 2002.  (Doc. #41, defendant's exhibit N).  Ms. Hodges worked on the second shift with Fagan Robinson.  Ms. Hodges maintains that Robinson would constantly stand behind her when she did her work.  (Defendant's exhibit M, Hodges depo. at pp.140-41).  Frequently Robinson would make comments about women customers.  (Docs. #142-43).  When Robinson conducted an evaluation of Hodges's performance, he told her that he would not give her a raise because "... somebody might think I'm f------ you."  Ms. Hodges contends that Robinson frequently made statements that implied that he wanted Hodges to come to his house.  He

---

[17]/     McNeal claims that the predecessor to Crumpton knew that Ward took coffee and did not object.

asked her not to tell her boyfriend that she was going to come.  In December of 2002, he asked "why don't you come over and see me tonight?"  After asking he pinched Ms. Hodges's breast.  According to Ms. Hodges, a few seconds later Robinson grabbed or pinched her vagina.  (pp.212-214).  On that particular day, Robinson had asked at least five times for Hodges to come to his house.  He told her such things as "I want to f— you" or "Come on, Melanie, why don't you give us some of that snatch up."  (Hodges depo. at pp.217-18).  After Robinson had groped her, Ms. Hodges told Laquilla Ann McNeal and shift leader Andy Dunn.  ( *Id*. p.118).[18] According to Ms. Hodges she reported to Tony Ojo, the manager of the parts department, that she had been harassed by Robinson.  Ojo advised her to write to Crowley, the general manager.  He urged her to write to Crowley about Robinson's constant pressure but advised her not to write about sexual harassment.  (Hodges at pp.174-75, 177-78).  After her letter was received, Robinson was assigned to the fuel desk.  Hodges testified that Barrell told her that the transfer was the result of her complaints of sexual harassment.  (Hodges depo., pp.259-260).  She also learned from Cindy Kelly and Doxkey Eddings that Robinson's reassignment was because of the sexual harassment complaint.  ( *Id*. at pp.262-263).  In her EEOC complaint Ms. Hodges related that Robinson physically, verbally and mentally abused her.  ( *Id*. at p.306).  Ms. Hodges claims that she was humiliated by Robinson's conduct.  ( *Id*. at p.212).  Ms. Hodges stated that she was afraid to report the harassment because she did not want to lose her job.  Ms. Hodges acknowledges that she had absenteeism problems and received written counseling for her lack of reliability.  (pp.186-187).  Six weeks after Robinson was transferred, Ms. Hodges was fired by Tim Barrell when she called in to say she would not be in.  (pp.286).  Ms. Hodges called Barrell to beg for her job.  (p.197).  A few days after talking to Barrell she telephoned the human

---

[18]/    As a shift leader, Dunn was not viewed by Hodges as a supervisor but a co-employee.  (pp.119-120).

resource department of the defendant and spoke with someone named Bruce.  (pp.197-199, 201).

She could not recall whether or not she told "Bruce" that she had been subjected to sexual

harassment.  (pp.205-206).  Ms. Hodges makes no constructive discharge claim, nor credible racial

discrimination claim.  She alleges a § 1981 claim for sexual harassment and a tort of outrage claim.

<u>SUBSTANTIVE LAW – GENERAL PRINCIPLE</u>

<u>Summary Judgment</u>

Summary judgment is available to defendant TA only if "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the declarations, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to summary judgment

as a matter of law.  Federal Rule of Civil Procedure 56(c), *see Celotex Corporation v. Catrett*, 477

U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The defendant, as the party seeking summary

judgment "bear[s] the initial burden to show the district court, by reference to materials on file, that

there are no genuine issues of material fact that should be decided by trial.  Only when that burden

has been met does the burden shift to the non-moving party to demonstrate that there is indeed a

material issue of fact that precludes summary judgment."  *Clark v. Coat & Clark, Inc.*, 927 F.2d 604,

608 (11th Cir. 1991; *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608.

The moving party can meet this burden by showing there is no dispute of material fact or by

showing that plaintiffs have failed to present evidence in support of some element of their case on

which they bear the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23, 106 S.Ct. 2548; see

Federal Rule of Civil Procedure 56(a) and (b).  Once the defendant has met this burden, Rule 56(e)

"requires the non-moving party to go beyond the pleadings and by ... affidavits or by the depositions,

answers to interrogatories and the admissions on file, designate 'specific facts showing that there is

a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.  The non-moving party need not present evidence in the form necessary for admission at trial, however, the movant may not merely rest on the pleadings.

The substantive law will identify which facts are material and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2505.

Supervisor – (The role of Fagan Robinson)

The pleadings, affidavits and deposition testimony of each plaintiff make clear that the plaintiffs recognized Robinson as a supervisor with the authority to hire, discipline and direct the activities of employees of TA.  During the relevant period of time, each plaintiff served directly under the supervision of Robinson.  In self-serving affidavits from by David Crumpton, Tim Barrell and Barry Richards, TA contends that Robinson did not have the authority to hire, fire or discipline. (Doc. #41, exhibits B, C, and D).  At the same time, however, TA has tendered documents purporting to reflect counseling and disciplinary reports which clearly identify Fagan Robinson as the "supervisor" of the named plaintiffs.  For example, exhibit K, a counseling report with respect to Doxkey Eddings dated February 3, 2002, (doc. #41), states the work place offense to be:

> Employee refused to follow request of her supervisor (Fagan Robinson).... [She] was advised if she ever questions her supervisor again she will be dismissed....

(Ellipsis in the document).

The report is signed by Fagan Robinson in the block for the "supervisor's signature."  The report does not merely indicate that Eddings's dismissal will be recommended by Fagan Robinson in the

event she were to later violate the policy, but clearly states that upon such an occurrence she "will be dismissed." ( *Id*.). Both Eddings and Hodges have introduced documents entitled employee performance reviews in which Robinson alone evaluated the work of the plaintiffs and signed the forms as the supervisor. (Doc. #47). In addition, the uncontradicted evidence is that Fagan Robinson accepted Rosilynn Richey's application for employment, Fagan Robinson telephoned Richey to tell her to come to work, and Fagan Robinson participated in her orientation and provided her with uniforms. The record is also uncontradicted that Robinson "clocked out" and sent home workers for alleged rules infractions and suspended other workers. Robinson directed employees in the manner in which their work was to be performed.

Robinson's role is critical because "where the person who has engaged in the unlawful conduct is not the plaintiff's supervisor but, rather, is one of the plaintiff's co-workers or a supervisor with no authority over the plaintiff, the plaintiff must show under the theory of *respondeat superior* that the employer 'knew or should have known of the harassment in question and fails to take proper remedial action.'" *Underwood v. Northport Health Services, Inc.*, 57 F. Supp. 2d 1289, 1303, 1304 (M.D. Ala. 1999). See also *McDaniel v. Fulton County School District*, 233 F. Supp. 2d 1364, 1375 (N.D. Ga. 2002). ("If the alleged harasser was not the plaintiff's supervisor, and thus did not have any power to take any tangible, adverse employment action against the plaintiff, ((such as firing or demoting her rejecting his sexual advances), then the employer may only be held liable for the co-worker's conduct if the employer knew or should have known of the harassment and failed to take prompt remedial steps.") A perpetrator who is merely a co-employee will not necessarily require an employer to be held directly liable for the harassing conduct. *Breda v. Wolff Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000). A victim of a co-worker harassment must show either

actual knowledge on the part of the employer or conduct sufficiently severe and pervasive to constitute constructive knowledge to the employer. (*See id*.; see also *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982)).

If, on the other hand, the harassment is perpetrated by a supervisor with actual authority over the plaintiff the employer may be held vicariously liable even when it did not have knowledge of the alleged harassing behavior. See *Faragher v. City of Boca Raton*, 524 U.S. 777, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Dees v. Johnson Controls World Service, Inc.*, 168 F.3d 417, 421-23 (11th Cir. 1999). "An employer is subject to vicarious liability to a victimized employee for actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Industries, Inc. v. Ellereth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 662 (1998). If a plaintiff demonstrates that a tangible employment action resulted from a refusal to submit to sexual demands then the corporate defendant is strictly liable. *Ellereth*, 524 U.S. at 753; *see also Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004). (Sexual harassment occurs "if the employee's refusal to submit to a supervisor's sexual demand results in a tangible employment action.")

In the context of Title VII, a supervisor is generally considered an agent of the employer. See 42 U.S.C. § 2000e(b). The Eleventh Circuit has held that the term "agent" should be liberally construed to affect Title VII's remedial purpose. See *Urquiola v. Linen Supermarket, Inc.*, 195 W.L. 266582 (M.D. Fla. 1995) (citing *Williams v. City of Montgomery*, 742 F.2d 586, 588 (11th Cir. 1984)). The Eleventh Circuit has never, however, clearly defined who is a supervisor for the purpose of imposing § 1981 or Title VII liability. "A supervisor need not necessarily be high in the business structure nor does he have to have the authority to hire, fire or promote in order to be considered an

agent whose conduct is binding on an employer." *Sims v. Montgomery County Commission*, 766 F. Supp. 1052, 1069 (M.D. Ala. 1990) (See also *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 76, 106 S.Ct. 2399, 91 L.Ed.2d 1986 (Marshall, J. concurring). ("A supervisor's responsibilities do not begin and end with the power to hire, fire and discipline employees or with the power to recommend such actions, but contemplate the day-to-day supervision of the work environment and ensuring a safe, productive work place.") It has long been established law that "supervisors with the capacity to hire and fire <u>or those who can recommend such decisions</u> are subject to liability under § 1981." *Liege v. Capital Chevrolet, Inc.*, 895 F. Supp. 289, 293 (M.D. Ala. 1995) (Citing *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975))[19/] (emphasis added). Moreover, as foreseen in *Ellereth*, occasionally an unusual circumstance may arise when the victim has a "false impression that the actor was a supervisor, when in fact he was not." *Ellereth*, 524 U.S. at 769, 118 S.Ct. 2257. A harassing employee, endowed with limited actual authority to monitor co-employees, will sometimes cause co-employees to believe he has more authority than he actually possesses. The Supreme Court has concluded that such conduct is foreseeable by the employer. *See Faragher*, 524 U.S. at 798, 118 S.Ct. 2275. In such a case liability will attach to the employer under the doctrine of apparent authority, provided the victim reasonably believed that the harasser possessed supervisory powers. *See Ellereth*, 524 U.S. at 759, 118 S.Ct. 2257. (Discussing apparent authority).

---

[19/]   Title VII and 42 U.S.C. § 1981 have the same proof requirements and are analyzed within the same framework. *Bass v. Board of County Commissioners, Orange County, Florida*, 256 F.3d 1095, 1109 n.4 (11th Cir. 2001); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

An employer may defeat the employee's tangible employment action theory in one of two ways. First, the employer may submit proof that the employment decision does not rise to the level of a "tangible employment action." *See, e.g., Smith v. Cashland*, *Inc.*, 193 F.3d 1158, 1159 (10th Cir. 1999). *See also, Ellereth*, 524 U.S. at 753. "A tangible employment action constitutes a significant change in the employment status, such as hiring, firing, failing to promote, reassignment with significant different responsibilities, or decision causing a significant change in benefits." *Ellereth*, 524 U.S. at 761. A "significant change in benefits," within the meaning of *Ellereth*, also occurs when a "reduction in employee's hours" results in a reduction in that employee's "take home pay." *Cotton v. Cracker Barrell Old County Store*, *Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006). Second, the employer may argue that there is no "causal connection" or "causal link" between the tangible employment action and sexual harassment. *Id.* at 1232. (The plaintiff "had to prove more than a mere reduction of her hours; [she] had to prove that the reduction was causally related to the incident of harassment.").

In light of the significant, compelling evidence that Fagan Robinson was in fact a supervisor, the affidavits of TA's current management at best create a material issue of fact on that question.[20] Even if Robinson did not possess the power to hire, fire or discipline, a fact finder could conclude that the plaintiffs reasonably believed he had such authority.

---

[20] If Robinson was a supervisor as the evidence strongly suggests he was and there was a tangible employment action, the resulting liability of the employer exists regardless of whether the employee took advantage of any employer-provided system for reporting harassment. *See Hulsey*, 367 F.3d at 1245. It is of no significance that Robinson was acting only to satisfy his own ends. "[The] employer 'is not insulated from liability by the fact that [its supervisor] was acting entirely for his own benefit.'" *Sims*, 767 F. Supp. at 1069 (*quoting Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1558-59 (11th Cir. 1987)).

17

<u>TITLE VII – (GENERAL PRINCIPLES)</u>

<u>Sexual Harassment</u>

Under both Title VII to the Civil Rights Act and 42 U.S.C. § 1981 it is, in general, illegal for an employer to discriminate against its employees because of their race or sex.  42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981.[21/] As noted, Title VII and § 1981 have the same substantive proof requirements and are analyzed under the same framework.  In *Walton v. Johnson & Johnson Services, Inc.*, the Eleventh Circuit reiterated the standard that governs vicarious liability of employers for harassing conduct of supervising employees.  347 F.3d 1272, 1280-81 (11th Cir. 2003) (*Quoting Frederick v. Sprint /United Management Co.,* 246 F.3d 1305, 1311 (11th Cir. 2001)).  The court stated that "'Courts should no longer use labels "*quid pro quo*" and "hostile environment" to analyze whether an employer should be held liable under an employee's Title VII claim that is, based upon a supervisor's sex-based harassment.'" *Id*. at 1280.  Instead, the Eleventh Circuit has stated that courts should separate sexual harassment cases into two groups: (1) cases where a "tangible employment action" was taken because of an agent's misuse of authority and (2) cases where there was no "tangible employment action" taken.  See *id*.  An employer is automatically liable for sexual harassment cases falling into the first group, but for the second group, the employer may raise what has been referred to as the *Faragher/Ellereth* affirmative defense.  See *Id*. at 1280-81.[22/] To

---

[21/]    There is a procedural distinction between 42 U.S.C. § 1981 and Title VII that has some relevance to the claims of Ms. Hodges.  Claims properly presented pursuant to 42 U.S.C. § 1981 do not require timely exhaustion of administrative remedies with the EEOC prior to filing suit.  See *Sanders v. City of Montgomery,* 319 F. Supp. 2d 1296, 1311 (M.D. Ala. 2004).  However, as a condition precedent to the right to file a civil action under Title VII of the Civil Rights Act of 1964 a plaintiff must bring suit within 90 days of the issuance of a right to sue letter.  *Forehand v. Florida State Hospital at Chattahoochee*, 89 F.3d 1562, 1567-1568 (11th Cir. 1996).

[22/]    Conceptionally, the Eleventh Circuit's instruction arises directly from the Supreme Court's opinion in *Ellereth*.  524 U.S. at 753, 118 S.Ct. 2257.  In *Ellereth*, the court commented that previous decisions of vicarious liability encouraged Title VII plaintiffs to state *quid pro quo* claims because such claims equated to vicarious liability.

otherwise establish a *prima facie* case a plaintiff must show (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that there was a basis for holding the employer liable. *Pipkins v. City of Temple Terrace, Florida*, 267 F.3d 1197, 1199 (11ᵗʰ Cir. 2001). A plaintiff must also show that she suffered some tangible employment action which has been defined by the Supreme Court such as "a significant, hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing significant change in benefits." *Burlington Industries v. Ellereth*, 524 U.S. at 753, 754, 118 S.Ct. at 2265, 143 L.Ed.2d 633.

In the event the conduct is not at the hands of a supervisor the plaintiffs bear a different burden in the context of Title VII sexual harassment. In such a case a plaintiff may prove that the harassment culminated in a tangible employment action such as demotion, discharge or transfer, *Ellereth*, 524 U.S. 742, or that she suffered sexual harassment that was severe and pervasive. *Id*. at 754, 118 S.Ct. at 2265.[23/] A hostile work environment claim of tangible employment action under Title VII is established upon proof that "the work place is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370. To establish a *prima facie* case a plaintiff must demonstrate that the harassment was based

---

See *id*. at 753, 118 S.Ct. 2257. According to the Supreme Court, the terms *quid pro quo* and hostile work environment remain relevant to the threshold question of whether a plaintiff can prove discrimination in violation of Title VII. See *id*. at 753-54, 118 S.Ct. 2257. However, the terms are irrelevant in determining whether an employer is vicariously liable. See *id*. at 754, 118 S.Ct. 2257 (stating whether "tangible employment action" occurs, and not the category of sexual harassment, *quid pro quo* or hostile work environment, controls the issue of vicarious liability).

[23/] It is significant that in the non-supervisor context the *Faragher/Ellereth* defense remains viable.

upon the protected characteristic of the employee such as sex or race. *Mendoza v. Borden,* 195 F.3d 1238, 1245 (11th Cir. 1990).  To determine whether the harassment was severe or pervasive enough to alter the terms and conditions of employment, a court is required to consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing and applying *Harris*, 510 U.S. at 23, 114 S.Ct. at 367).  In addition the aggrieved employee must satisfy both an objective and subjective test.  See *Mendoza*, 195 F.3d at 1246.  The employee must establish not only that she subjectively perceived the environment as hostile but that a reasonable person would perceive the environment to be hostile and abusive.  *Watkins v. Bowden*, 105 F.3d 1344, 1355-56 (11th Cir.1997).  The objective severity of the harassment must be judged from the perspective of a reasonable person in the employee's position considering all of the circumstances.[24/]

Title VII – Racial Discrimination

In the event a plaintiff seeks to prove that she was treated differently than similarly situated employees as a product of race discrimination, the appropriate framework for the analysis is the familiar burden shifting process in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Commercial Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  In *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999), the Eleventh Circuit established that, "[t]o establish a *prima facie* case of disparate

---

[24/]     A hostile work environment once established is a tangible employment action as is disparate treatment with respect to conditions of employment including discipline.  A hostile work environment if proven satisfies Title VII or § 1981.  In this sense, a hostile work environment is a way of proving a tangible employment action.  A disparate treatment claim must also include proof of a tangible employment or adverse employment action.  Each individual "claim" is then a method of proving intentional racial or sexual discrimination.  *Hulsey*, 367 F.3d at 1246.

treatment, appellant must show: (1) she was a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated white employees more favorably; and (4) she qualified to do the job." If a *prima facie* case is demonstrated then, but only then, the defendant must articulate "some legitimate non-discriminatory reason for [the adverse employment action]. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1824. Once the defendant satisfies this exceedingly light burden, the plaintiff is then required to demonstrate that the proffered reason was merely a pretext for racial discrimination. See *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1089. Unquestionably "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. To satisfy the burden of demonstrating that persons not members of the protected class received dissimilar or better treatment, a plaintiff must demonstrate that she and the non-protected class member employees "are similarly situated in all relevant respects." See *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997); *Jones v. Gerwins*, 874 F.2d 1534, 1539 (11th Cir. 1989). To prove that a plaintiff was treated less favorably than similarly situated individuals outside the protected class, "evidence that similarly situated employees are disciplined more leniently is admissible to support a disparate treatment claim." *Anderson v. WBMG-42*, 253 F.3d 561, 564 (11th Cir. 2001). Employees are similarly situated when "the comparator employees are involved in or accused of the same or similar conduct yet are disciplined in a different, more favorable manner." ( *Id*., *quoting Holifield*, 115 F.3d at 1562.) "[T]he quantity and quality of the comparator's misconduct [must] be merely identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Maniccia*, 171 F.3d at 1368.

21

Retaliation

Title VII recognizes two forms of statutorily protected conduct.  An employee is protected from retaliation and discrimination if (1) "[she] has opposed any practice made an unlawful employment practice by this subchapter" (the opposition clause) or (2) "[she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause).  42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation through circumstantial evidence a "plaintiff ... must ... show [   ] that (1) the plaintiff engaged in statutorily protected activities; (2) the employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse action.  *Berman v. Orkin Exterminating Co., Inc.,* 160 F.3d 697, 701 (11th Cir. 1998).  "To establish [a] causal connection, a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" *Clover v. Total Systems Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (*quoting Simmons v. Camden County Board of Education*, 757 F.2d 1187, 1189 (11th Cir. 1985)).  Temporal proximity between the protected activity and the adverse employment action may suffice to show a causal connection if there is any other evidence suggesting that the employer-defendant was aware of the protected expression.  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

Proof of retaliation is also governed by the same framework of shifting evidentiary burdens established in *McDonnell Douglas* and *Burdine*.  *Donnellon v. Fruehauff Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993).  To prevail, a plaintiff must first establish a *prima facie* case of retaliation.  *Goldsmith*, 996 F.2d at 1162-63; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991).  Once a *prima*

facie case has been established, the employer must come forward with a legitimate, non-discriminatory reason for its action. *Donnellon*, 794 F.2d at 600-601; *see also Weaver*, 922 F.2d at 1525-1526. If the employer carries that relatively light burden the plaintiff bears the burden of demonstrating by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. However, to prevail on a claim of retaliatory discharge, it is not necessary to show that the discharge itself was the product of discriminatory disparate treatment. *See Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1996). ("Under Title VII, it is well established that an employee need not prove the underlying claim of discrimination in order to establish a retaliation claim.") Rather it is enough that the discharge was causally connected to a complaint of unlawful discrimination. See *Woodson v. Scott Paper Co.*, 109 F.3d 913, 923 (3d Cir. 1997).

Voicing concerns to superiors about illegal discrimination qualifies as protected expression. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997); *see also Rollins v. State of Florida Department of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). ("[W]e recognize that the protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like [the plaintiff], who informally voiced complaints to their superiors.")

Complaints concerning sexual harassment made directly to the harasser/supervisor is protected activity and clearly a means of opposing such unlawful conduct. *Pipkins v. City of Temple Terrace,* Florida, 267 F.3d 1197, 1201 (11th Cir. 2001) ("[s]tatutorily protected expression includes internal complaints of sexual harassment to superiors.") See*, e.g., Little v. National Broadcasting Co.,* 210 F. Supp. 2d 330, 386 (S.D. N.Y. 2002) (Finding that rejecting a supervisor's sexual advances constitutes protected activity under Title VII.); *Farrell v. Planters LifeSavers Co.*, 22 F. Supp. 2d 372, 392 (D.C. N.J. 1998) ("Rejection of sexual advances is a protected activity within the

meaning [of] Title VII.") Under the opposition clause of Title VII warning a harasser/superior that complaints of sexual harassment will be or should be reported is an expression of opposition to an unlawful employment practice.

<u>Section 1981 – General Principles</u>

Title 42 U.S.C. § 1981 addresses racial discrimination in contractual relationships.  As amended by the Civil Rights Act of 1991 the statute reads in relevant part:

> (a)  All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts ... as is enjoyed by white citizens ....
>
> (b)  For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c)  The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of state law.

42 U.S.C. § 1981(a)-(c).

Litigation involving 1981 most commonly involves the right to make and enforce contracts of employment.  *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).  To establish a claim under § 1981, plaintiffs must show that (1) they are members of a racial minority; (2) that the defendant had an intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute.  See *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994).  It is an organizing principle of § 1981 that it is applicable to claims of racial discrimination whether the aggrieved party is African American or Caucasian.  *Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976);

*McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, 295, 96 S.Ct. 2574, 2586, 49 L.Ed.2d 493 (1976).   A claim of gender discrimination including sexual harassment cannot be maintained under § 1981.  *Kilcrease v. Coffee County, Alabama*, 951 F. Supp. 212, 215 (M.D. Ala. 1996) (*quoting Kodish v. United Airlines, Inc.*, 628 F.2d 1301 (10th Cir. 1980); *Runyon v. McCrary*, *supra*.  *See also Bobo v. ITT Continental Banking Company*, 662 F.2d 340 (5th Cir. Nov. 21, 1981) ("The principal issue raised by this appeal is whether 42 U.S.C. § 1981, derived primarily from the Civil Rights Act of 1866, 14 Stat. 27, encompasses claims of sex discrimination.  The clear answer is that it does not.")

State law claims entwined or occurring contemporaneously with federal claims are within the subject matter jurisdiction of the United States District Court.  28 U.S.C. § 1367.  The statute reflects a dichotomy between a federal court's power to exercise supplemental jurisdiction, § 1367(a), and its discretion not to exercise such jurisdiction, § 1367(c).  See *Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1563 (11th Cir. 1994).  *See also Myers v. County of Lake, Indiana*, 30 F.3d 847, 849 (7th Cir.), *cert. denied,* 515 U.S. 1058, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994) ("Section 1367 divides into stages the identification of pendent claims suitable for federal adjudication.")  Subsection (a) of 1367 establishes a district court's power to exercise supplemental jurisdiction over all supplemental claims which form part of the same "case or controversy" under Article III of the Constitution.   *Palmer*, 22 F.3d at 1566.   The constitutional "case or controversy"standard confers supplemental jurisdiction over all state claims which arise out of a common nucleus of operative facts with substantial federal claims.  *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724-25, 86 S.Ct. 1130, 1138, 13 L.Ed.2d 218 (1966).  When no federal question claims are left in the case, prudential considerations would prompt a court to question the

propriety of retaining jurisdiction over a remaining state law claim.  *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11ᵗʰ Cir. 1999) (Stating that a district court may dismiss state law claims after dismissing federal claims; "[m]ore specifically — if the claims are dismissed prior to trial, [*United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)] strongly encourages or even requires dismissal of state claims."  Moreover, "[b]ecause 28 U.S.C. § 1367(d) tolls any applicable state statute of limitations, there is no unfairness to the plaintiff resulting from dismissal."  *Smith ex rel. Lanthan v. Green County School District*, 100 F. Supp. 2d 1354, 1368 (M.D. Ga. 2000).  *Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 1005 (11ᵗʰ Cir. 1993).

Alabama law recognizes egregious sexual harassment as within the ambit of the tort of outrage.  See *Henry v. Georgia-Pacific Corporation*, 730 So.2d 119 (Ala. 1998).  The tort of outrageous conduct applies "in the most egregious circumstances."  *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala. 1993).  As the Alabama Supreme Court has made clear:

> [M]ere insults, indignations, threats, annoyances, petty oppressions, or other trivialities [do not constitute outrageous conduct].  The rough edges of our society are still in need of a good deal of filing down and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind.

*Surrency v. Harbison*, 489 So.2d 1097, 1105-06 (Ala. 1986).   However, Alabama law has recognized albeit *in dicta* that repeated sexual advances, lewd remarks, and patently offensive behavior by a supervisor are sufficient to present a question of outrageous misconduct to a jury.  *Busby v. Truswal Systems Corporation*, 551 So.2d 322 (Ala. 1989).  It is true that mere requests by a supervisor for an employee to have dinner with him, to kiss him or to have an affair with him does

not rise to the level of outrageous conduct. *McIsaac v. WZEW–FM Corp.,* 495 So.2d 649, 651 (Ala. 1986).  On the other hand, to be actionable it is not necessary that the conduct include a physical groping or assault.  *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820 (Ala. 2000).  In *Busby* for example the court concluded that repeated sexual advances, lewd remarks and offensive behavior that included an invitation for the plaintiff to swim nude with harasser, his desire for the plaintiff to come to work braless, to wear fewer clothes and act as if he was going to pinch one of the plaintiff's breasts with a pair of pliers or his hands while putting his arm around her was sufficient for a jury to consider the tort of outrage.

## APPLICATION OF LAW TO FACT

Rosilynn Richey

Taken in a light most favorable to Ms. Richey, the evidence establishes that she was interviewed, hired, trained and supervised by Fagan Robinson.  Even before she began her formal employment with TA,  Robinson had begun to sexually harass her by requesting that she come to his trailer and telling her that he was a horny old man.  After her orientation she was sexually groped by Robinson.  Throughout her brief employment she was asked a number of times to come to Robinson's trailer with the clear intent that she provide him sex.  He stated that he wanted to f— her on several occasions.  After his demands were rebuffed, he began to criticize her work in front of customers and co-employees.  He reported a cash shortage from cash drawer which may not have occurred. He ultimately suspended Ms. Richey purportedly because of a difficulty in approving the use of gas pumps.  At the time Ms. Richey was fired, there were two employees at the fuel desk and

27

only Ms. Richey was terminated.[25] While Ms. Richey may not be able to sustain her burden of proof there is a material issue of fact concerning (1) Fagan Robinson's status as a supervisor, (2) whether his conduct related to her alleged employment deficiencies was in fact motivated by his frustration at her refusal to participate in sexual activity with him, and (3) whether her termination was an adverse employment action directly caused by his having been rebuffed.  In that Robinson appears to be a supervisor, there is no issue to be resolved with regard to whether Ms. Richey did or did not report the alleged misconduct.  The *Ellereth/Faragher* defense is not available.

On the other hand, if Robinson is not a supervisor, Ms. Richey is precluded from pursuing her claims because of her failure to report the alleged sexual harassment.  The specific conduct alleged does not rise to the level of the tort of outrage as that term is defined by the law of the state of Alabama.  There is no "constructive discharge" claim.  The evidence does not establish that race played any part in the termination of Ms. Richey.  The only claim to go forward is the adverse employment action involving her discharge after refusing to participate in sex.

Doxkey Eddings

Ms. Eddings contends that she observed Fagan Robinson sexually harass one woman.  She avers that she learned of additional acts of sexual harassment committed by Fagan Robinson against other women.  She confronted Robinson, although indirectly, and told him that the victims of sexual harassment should report his conduct.  Almost immediately after this announcement, Ms. Eddings

---

[25]    The defendant contends that it is "undisputed that during her two (2) weeks of employment, Ms. Richey's cash drawer had come up short by more than $100."  (Doc. #58, p.16).  Ms. Richey expressly disputes that contention in her deposition.  Moreover, the defendant's contention that Ms. Richey was terminated for her "verbal confrontation with Robinson" ignores the circumstantial evidence that it was a result of her refusing to have sex with him.  Finally, the contention that her "subsequent arrest" was the reason for her termination is simply not supported by the record.  She was sent home by Robinson.  There is no indication that TA ever expected her to return.  She later raised the question herself after resolving her state court difficulties.

was terminated allegedly for keeping her Bible on the desk, an act she contends had been approved by her general manager.  Ms. Eddings was retaliated against for engaging in protected activity, that is, objecting to the sexual harassment of others.  Ms. Eddings fails to demonstrate that any Caucasian comparator is similarly situated and she makes no viable race claim under Title VII or § 1981.[26/]

LaQuilla McNeal

Ms. McNeal contends that she was the victim of racial discrimination.  Her deposition establishes however that the alleged harasser, Fagan Robinson, "yelled" at white and black employees alike.  It is true that Ms. McNeal filed a complaint with EEOC based on racial discrimination however her termination did not occur until eleventh months after that complaint. Ms. McNeal asserted as a matter of fact that she and similarly situated white employee were treated differently in that she was terminated "immediately" and did not know whether the white employee had in fact been terminated.  The undisputed evidence is however that the white employee was also terminated.  The decision maker involved in her dismissal was a new general manager and was not heard to make any racially disparaging remarks at any time.  Ms. McNeal was never subjected to sexual harassment.[27/]  Ms. McNeal cannot make a *prima facie* case of racial discrimination and her claims are due to be and are hereby dismissed.  There are simply no discrete § 1981 claims.

Melanie Hodges

Ms. Hodges has filed her cause of action by amendment to the existing complaint.  It is undisputed that her lawsuit was not filed in conformity with the condition precedent time frame in

---

[26/]    While 1981 liability might lie against the individual defendant Fagan Robinson, no plaintiff has in fact made such a claim.  As a consequence the 1981 Title VII analysis is applicable to only Title VII.

[27/]    The single incident she noted in her deposition stands alone and does not indicate any sexual connotation.

which to bring a Title VII action.  Her attempt to convert her Title VII claim to a § 1981 claim on gender grounds is foreclosed as a matter of law.  Ms. Hodges's tort of outrage claim may or may not be viable but in any case is so dissimilar from the cause of action presented by Richey and Eddings that the court declines to exercise jurisdiction over that claim and DIRECTS that it be DISMISSED without prejudice and REMANDED to the appropriate circuit court of the state of Alabama.[28/]

Accordingly, the only remaining claims in this action are Richey's adverse employment action related to her discharge after rebuffing a *quid pro quo* demand for sex and Doxkey Eddings's retaliation claim that she was terminated after opposing unlawful sexual harassment of co-employees by an agent/supervisor of the defendant.

All remaining claims are DISMISSED and the defendant's motion for summary judgment on those claims is GRANTED.  By separate order a trial schedule will be entered for the remaining claims of Richey and Eddings.

As to the foregoing it is SO ORDERED this the 31st day of March, 2006.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE

---

[28/]   The factual averments, however, are similar and Ms. Hodges's testimony would appear to be material and relevant to the claims of Eddings and Richey.